No. 16-11403

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Brandy Wallace, as personal representative of the
Estate of Ronald Wesley Sexton,

Plaintiff-Appellee,

v.

Nicolo Mangiaracina, Justin Morales, Michael Romano, Anthony Holloway, and
City of St. Petersburg,

Defendants-Appellants.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT TO FLORIDA
TAMPA DIVISION
CASE NO. 8:14-cv-3022-T-24AEP

BRANDY WALLACE
APPELLEE'S BRIEF

MICHAEL P. MADDUX, ESQUIRE
Florida Bar No: 964212
Attorney for Appellant
Michael P. Maddux, P.A.
2102 West Cleveland Street
Tampa, Florida 33606
Phone: 813-253-3363
Fax: 813-253-2553
Email: mmaddux@madduxattorneys.com

### APPELLEE'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellee, BRANDY WALLACE, by and through the undersigned Counsel, hereby discloses the following pursuant to this Court's interested persons order:

1. Bellomio Commons, Linda

2. Bucklew, Susan C.

3. City of St. Petersburg, Florida

4. Holloway, Anthony

5. Maddux, Michael P.

6. Mangiaracina, Nicolo

7. Morales, Justin

8. Patner, Joseph P.

9. Romano, Michael

10. Sexton, John

11. Sexton, Joshua

12. Sexton, Vicki

13. Wallace, Brandy

C1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Brandy Wallace, pursuant to the Federal Rules of Appellate Procedure 34(a), requests oral argument. This appeal presents questions involving numerous facts and significant legal issues with substantial public impact regarding the use of force. Oral argument would assist the Court in addressing these issues.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT……………………………………………C1-1

STATEMENT REGARDING ORAL ARGUMENT………………………………i

TABLE OF CITATIONS......................................................................................iv

STATEMENT OF THE CASE……………………………………………..1

A. Statement of the Facts…………………………………………………1

SUMMARY OF ARGUMENT……………………………………………1

ARGUMENT AND CITATIONS OF AUTHORITY……………………………..3

I.     THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S
       FINDING THAT THERE ARE GENUINE ISSUES OF
       MATERIAL FACT………………………………………………..3

       1.     There is a Genuine Dispute of Material Fact Whether Mr.
              Sexton Was in Possession of a Firearm……………….…………4

       2.     The Internal Affairs Statement Should Not Be
              Considered……………………………………………..……………5

       3.     Joshua Sexton's Earliest Sworn Testimony is the Most
              Credible……………………………………………………...………9

       4.     Joshua Sexton's Testimony is Not Contradicted by the
              Record……………………………………………..…………11

       5.     A Jury Must Make Credibility Determinations……..………..13

II.   THE COURT SHOULD AFFIRM THE DISTRICT COURT'S
      FINDING THAT DEFENDANTS ARE NOT ENTITLED TO
      QUALIFIED IMMUNITY…………………….…………...…...…..15

      1.   Constitutional Violation ……...………………………………16

      2.   Clearly Established………………………………………..…..22

CONCLUSION………………………………………………………......27

CERTIFICATE OF COMPLIANCE………………………………………...28

iii

# TABLE OF CITATIONS

**Cases**                                                    **Page**

*Anderson v. Liberty Lobby, Inc.*
477 U. S. 242 (1986)……………………………………………….…3

*Aquilar v. U.S. Atty. Gen*
381 Fed. Appx. 924 (11th Cir. 2010)……………….…….…..9, 10

*Carr v. Tatangelo*
338 F.3d 1259 (11th Cir. 2003)……………...…..………..5-6, 11

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)…………………………………………..3

*Crosby v. Paulk*
187 F.3d 1339 (11th Cir. 1999)……………………...…………..…16

*Dudley v. City of Monroeville*
446 Fed. Appx. 204 (11th Cir. 2011)…………………………...……5-6, 11

*Eddings v. Oklahoma*
455 U.S. 104 (1982)…………………………………………..6-7

*Edwards v. Shanley*
2012 U.S. App. LEXIS 640 (11th Cir. 2012)……………………………..13

*Evans v. Stephens*
407 F.3d 1272 (11th Cir. 2005)……………………………………12

*Gall v. United States*
552 U.S. 38 (2007)…………………………………...……….6-7

*Gallegos v. Colorado*
370 U.S. 49 (1962)……………………………………….…..7, 8

*Garczynski v. Bradshaw*
573 F.3d 1158 (11th Cir. 2009)………………………………..…25

*Graham v. Connor*
490 U.S. 386 (1989)……………………………………………………2, 17, 22, 26

*Hadley v. Gutierrez*
526 F.3d 1324 (11th Cir. May 6, 2008)………………….…………………16, 19

*Haley v. Ohio*
332 U.S. 596 (1948)…………………………………………………………....…7

*Harlow v. Fitzgerald*
457 U.S. 800 (1982)…………………………………………...……….....15, 22

*Holloman ex rel. Holloman v. Harland*
370 F.3d 1252 (11th Cir. 2004)…………………………………...……..23-24

*Hope v. Pelzer*
536 U.S. 730 (2002)…………………………………..……………………22- 23

*Hunt  v. Cromartie*
526 U.S. 541 (1999)……………………………………………………....14

*J. D. B. v. North Carolina*
564 U.S. 261 (U.S. 2011)……………………….……………......…..6-7

*Johnson v. Texas*
509 U.S. 350 (1993)……………………………..……………………………7

*Jones v. City of Columbus, Ga*
120 F.3d 248 (11th Cir. 1997)……………………………………...……….3

*Kenning v. Carli*
2016 WL 1534002 (11th Cir. 2016)………………………….………11

*Kesinger v. Herrington*
381 F.3d 1243 (11th Cir. 2004)……………………………...………..11

*Lancaster v. Monroe County*
116 F.2d 1419 (11th Cir. 1997)………………………………...…..2, 5

v

*Lee v. Ferraro*
284 F.3d 1188 (11th Cir. 2002)……………………...…………………………...15, 23

*Lenning v. Brantley County, Ga.*
579 Fed.Appx. 727 (11th Cir. 2014)……………………………………...…..25

*Marsh v. Butler County*
268 F.3d 1014 (11th Cir. 2001)……………………………..…………………22-23

*McCullough v. Antolini*
559 F.3d 1201 (11th Cir. 2009)…………………………………………..……..15, 25

*Mercado v. City of Orlando*
407 F.3d 1152 (11th Cir. 2005) ……………………………………………22, 26

*Morton v. Kirkwood*
707 F.3d 1276  (11th Cir. 2013)…………………………………………..………3-4

*Oliver v. Fiorino*
586 F.3d 898 (11th Cir. 2009)…………………………………….…………15, 16, 22

*Pearson v. Callahan*
129 S. Ct. 808 (2009)……………………………………………………...……………16

*Penley v. Eslinger*
*605 F. 3d 843* (11th Cir. 2010)………………………………………………..25

*Perez v. Suszczynski*
809 F.3d 1213 (11th Cir. 2016)……………………...……………………17, 22, 24, 26

*Quiles v. City of Tampa Police Dept.*
596 Fed.Appx. 816 (11th Cir. 2015)……………………………………...……..25

*Rada v. Miami-Dade County*
2006 U.S. Dist. LEXIS 89510 (S.D. Fla., 2006)……………….…………..24, 26

*Riordan v. O'Shea*
*448 Fed.Appx 928* (11th Cir. 2011)…………………………………………25

*Robinson v. Arrugueta*
415 F.3d 1252 (11th Cir. 2005)……………………………………………...…16-17

*Roper v. Simmons*
543 U.S. 551 (2005)……………………………………………………..………7

*Scott v. Harris*
550 U.S. 372 (2007)……………………………....……………………...4, 11, 16

*Smith v. Mattox*
127 F.3d 1416 (11th Cir. 1997)……………………………………....…..24, 26

*Tennessee v. Garner*
471 U.S. 1 (1985)……………………………………………………………26

*Tolan v. Cotton*
134 S. Ct. 1861 (U.S. 2014)…………………………………………..………3

*United States v. Lanier*
520 US. 259 (1997)……………………………….…………………………23

*Vinyard v. Wilson*
311 F.3d 1340 (11th Cir. 2002)………………………………………………...18

*Wilson v. Layne*
526 U.S. 603 (1999)…………………………………………………...……22, 23

*Yarborough v. Alvarado*
541 U.S. 652 (2004)………………………………………………………….7

## <u>Rules</u>

Fed.R.Civ.P. 56(c)…………………………………………..………...3, 5, 6

## <u>Statutes</u>

*Fla. Stat. § 790.10*………………………………………....………………18

vii

## STATEMENT OF THE CASE

### A. Statement of the Facts

The following material facts are critical to the Summary Judgment determination. Mr. Sexton's then ten year old son, Joshua Sexton, observed the incident from the window inside his home. (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 13) Joshua testified that his father dropped his gun and kicked it off of the porch prior to the shooting. (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 13) It is unclear exactly which law enforcement officer gave Mr. Sexton commands and what those commands were, but at least one law enforcement officer yelled to Mr. Sexton, "Police. Show me your hands. Let me see your hands[,]" as well as "get on the ground" and "drop your gun." (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 14-16) In response, Mr. Sexton dropped his cellular phone, put his hands in the air, dropped to one knee, and started to proceed to a prone position. (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 15-17) Before he could get to the prone position, however, the Officers shot and killed the unarmed Mr. Sexton. (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 17)

## SUMMARY OF ARGUMENT

The District Court properly denied Summary Judgment in favor of the Defendants.

1

The granting of a summary judgment is appropriate only when there are no genuine issues of material fact. *Lancaster v. Monroe County*, 116 F.2d 1419 (11th Cir. 1997). Here, there is a dispute of material fact with regards to whether Mr. Sexton was in possession of a firearm and/or pointed the firearm at the officers, and therefore summary judgment is not appropriate.

Qualified Immunity is inappropriate at this stage of litigation, as material questions of fact exist for resolution by a trier of fact. Taking the Plaintiff's version as true and drawing all reasonable inferences in Plaintiff's favor, as the Court is required at that stage, the force used, shooting an unarmed man, could easily be considered excessive in violation of Ronald Sexton's Fourth Amendment rights. In addressing the three *Graham* factors, the Court must conclude, according to the Plaintiff's case, that there was no need for force, let alone deadly force, as Mr. Sexton had not committed any crime, let alone a serious crime, was compliant with the Defendants' commands and did not pose any threat to any individual. As such, the shooting was excessive and therefore violated Mr. Sexton's constitutional rights. Here, the disproportional force caused the untimely death of Mr. Sexton.

Therefore, the District Court was correct in denying Summary Judgment.

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.    THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S FINDING THAT THERE ARE GENUINE ISSUES OF MATERIAL FACT**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. City of Columbus, Ga.*, 120 F.3d 248, 251 (11th Cir. 1997); citing Fed.R.Civ.P. 56(c). Defendants carry the burden of establishing the absence of a genuine issue of material fact. *Jones* at 251; citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (U.S. 2014); citing *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255, (1986). The "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (U.S. 2014); citing *Anderson*, 477 U. S., at 249.

While the Court must look at the facts in the light most favorable to the Plaintiff, it cannot deny summary judgment based on testimony that is clearly contradicted by physical evidence. See *Morton v. Kirkwood*, 707 F.3d 1276, 1284

3

(11th Cir. 2013) ("'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Here, however, the physical evidence did not blatantly contradict Joshua Sexton's testimony.

### 1. There Is A Genuine Dispute Of Material Fact Whether Mr. Sexton Was In Possession of a Firearm

According to eyewitness, Joshua Sexton, Ronald Sexton, was complying with commands, had unarmed himself, but he was still shot by the Defendants. (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 14-16) Joshua swore under oath that his father removed his gun and then kicked it off the porch before the police arrived at their house. (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 13) Joshua then saw his dad put his hands up, start to drop on his knees and start to proceed to a prone position when he is shot. (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 14-16) A dispute exists among the parties as to who gave commands and what they were, but Joshua heard the officers yell "drop your gun." (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 14) Mr. Sexton dropped his cell phone. (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 15) Joshua witnessed his father almost get to the ground[1], in compliance with the Officers' commands, when the defendants "shot him for no reason." (Joshua Sexton Aff.,

---

[1] One knee was down and the other knee was halfway down. (Joshua Sexton Aff., Doc. 42-1, p. 2, ¶ 17)

Doc. 42-1, p. 2, ¶ 17) Officers Mangiaracina, Morales and Romano shot a total of seventeen (17) times, hit the unarmed Mr. Sexton, consisting of multiple entrance wounds in the back, resulting in his untimely death.

In direct contrast, Defendants all contend that Sexton pulled out the gun and pointed it at Officer Mangiaracina. (Mangiaracina Depo., Doc. 37-2, p. 24, lines 15-17; Morales Depo., Doc. 37-3, p. 33, lines 22-24; Romano Depo., Doc. 37-5, p. 17, lines 20-24, p. 18, lines 2)

Ultimately, the granting of a summary judgment is appropriate only when there are no genuine issues of material fact. *Lancaster v. Monroe County,* 116 F.2d 1419 (11th Cir. 1997). Here, there is clearly a dispute of material fact and therefore summary judgment is not appropriate.

### 2. The Internal Affairs Statement Should Not Be Considered

Defendants attempt to rely on Joshua Sexton's unsworn Internal Affairs interview as representative of his testimony for summary judgment purposes and to discredit all other sworn statements that he made regarding the incident.

The Internal Affairs statement by Joshua Sexton is an unsworn statement and therefore should be excluded. Unsworn statements do not meet the requirements of Rule 56, so the district court should not rely on the content of the

statement. *Dudley v. City of Monroeville*, 446 Fed. Appx. 204, 207 (11th Cir. Ala. 2011) citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.27 (11th Cir. 2003).

First, the statement was never signed by Joshua Sexton, in the presence of a notary. (Joshua Sexton IA Statement; Doc. 37-4, p. 16) Second, Plaintiff's Counsel was given two different audio versions of Joshua Sexton's statement, one pursuant to a Public Records Request, and the second pursuant to a discovery request. Although the transcript quotes, "I am a Notary Public for the State of Florida and for the purpose of this statement I am going to place you under oath. Do you swear or affirm that the following statement is the truth, the whole truth, and nothing but the truth so help you god? A: Yes" the audio provided pursuant to discovery does not reflect the answer of "yes." (Joshua Sexton IA Statement; Doc. 37-4, p. 1) For reasons unknown to Plaintiff's Counsel, the audio received pursuant to the Public Records Request does reflect the answer of "yes." Based on the inconsistencies in the audio, the statement should be disregarded. The unsworn statement by Joshua Sexton does not meet the requirements of Fed. R. Civ. P. 56(e), and therefore should be stricken because it lacks evidentiary value for summary judgment purposes.

Next, the internal affairs interview, of the ten year old child, is not an accurate portrayal of what he observed that night because he was alone and manipulated.  The Court has long held that, "[a] child's age is far "more than a

6

chronological fact." *J. D. B. v. North Carolina*, 564 U.S. 261, 272 (U.S. 2011); citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982); accord, *Gall v. United States*, 552 U.S. 38, 58 (2007); *Roper v. Simmons*, 543 U.S. 551, 569 (2005); *Johnson v. Texas*, 509 U.S. 350, 367 (1993). It is a fact that "generates commonsense conclusions about behavior and perception." *Yarborough v. Alvarado*, 541 U.S. 652, 674 (2004) (Breyer , J., dissenting). Such conclusions apply broadly to children as a class. *J. D. B.* at 272. And, they are self-evident to anyone who was a child once himself, including any police officer or judge. *Id.*

Time and again, the United States Supreme Court has drawn these commonsense conclusions for itself. *Id.* Addressing the specific context of police interrogation, the Court has observed that events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Id.* at 272 citing *Haley v. Ohio*, 332 U.S. 596, 599 (1948) (plurality opinion); see also *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) "[N]o matter how sophisticated," a juvenile subject of police interrogation "cannot be compared" to an adult subject). Describing no one child in particular, these observations restate what "any parent knows"--indeed, what any person knows--about children generally. *Id.* citing *Roper*, 543 U.S., at 569.

Joshua Sexton was interviewed by two adult Detectives, a female and male, **alone,** without his mother, who was not allowed to be present for the interview.

The Internal Affairs interrogation began at 6:15 am. (Joshua Sexton IA Statement; Doc. 37-4) This is after he had already given two consistent sworn statements earlier that morning. He was not given any opportunity to sleep prior to giving this third statement. A reading of the transcript shows that the techniques used by the Detectives were meant to confuse the child. (Joshua Sexton IA Statement; Doc. 37-4) Joshua Sexton's young age "generates commonsense conclusions about behavior and perception." One which makes it obvious that questioning a child for the third time after witnessing his father get shot and killed at his home and having no sleep is inappropriate and suspect. Multiple statements taken in one night promotes deteriorated answers; resembles relentless war style interrogation; and reveals a strategy to compromise and undermine answers that biased interviewers find unpalatable. While this technique may have been barely tolerable for Brandy Wallace, the distraught mother, "[N]o matter how sophisticated," a juvenile subject of police interrogation "cannot be compared" to an adult subject. *Gallegos* at 54.

Even through the tough and repeated questioning of Joshua, he continually stated that he saw his father throw the gun off the porch and saw his father complying with officers' commands prior to being shot. (Joshua Sexton IA Statement, Doc. 37-4, p. 6, 7) The questioners stop him repeatedly, taking the statements out of sequence to make it appear confusing and to negate his

statements. (Joshua Sexton IA Statement; Doc. 37-4)   The search for the truth becomes a search for the truth the police want.

All three Defendant officers that night had counsel present during their IA Interviews. (Depo of Mangiaracina; Doc. 37-2, p. 27, lines 24-25) (Depo of Morales; Doc. 37-3; p. 13, lines 13-21) Yet, the 10 year old, Joshua, had no one, not even his mother.  (Joshua Sexton IA Statement; Doc. 37-4) At the home, these officers forced him and his mother to stay in the home.  (Affidavit of Joshua Sexton; Doc. 42-1, ¶ 21) They were being guarded by an officer, and then driven to the station, then the officers separated him from his mother and still no attorney was offered to him. (Affidavit of Joshua Sexton; Doc. 42-1, ¶ 21) (Joshua Sexton IA Statement; Doc. 37-4)

Ultimately, Joshua's internal affairs statement is inappropriate to rely upon for summary judgement purposes, but may come in for impeachment at trial. Significantly, even if the Court finds it appropriate to consider the internal affairs statement by Joshua Sexton, which is unsworn and unsigned, it does not discredit Joshua Sexton's other sworn statements regarding the incident.

### 3. Joshua Sexton's Earliest Sworn Testimony Is the Most Credible

Defendants' argue the witness's earliest testimony should be considered the most credible, not struck. *Aquilar v. U.S. Atty. Gen*, 381 Fed. Appx. 924, 927 (11th Cir. 2010) (Doc. 47, p.2) The Internal Affairs statement by Joshua Sexton is NOT

his first statement, nor his second statement. (Joshua Sexton IA Statement; Doc. 37-4) In fact, his first statement was given at 3:37 am to Detective Miller. (Joshua Sexton Statement to Det. Miller; Doc. 50-1) During his first statement, Joshua Sexton is clear that he looked through the window and watched his father get shot, right in front of him, and fall to the ground. (Doc. 50-1, p. 4, 6). Joshua testified that his father dropped the gun and he was "shot for no reason." (Doc. 50-1, p. 5, 7). When asked if his father pointed the gun at the Officers, Joshua unequivocally answered, "No. They – when they said, 'Drop it," he dropped it." (Doc. 50-1, p. 7)

Joshua Sexton's second *sworn* statement was given at 5:52 am to Assistant State Attorney, Kendall Davidson. (Joshua Sexton Statement to ASA; Doc. 50-2) In that statement, Joshua Sexton is clear again that he, "…ran inside and then I looked through the blinds and I saw him get shot and everything." (Doc. 50-2, p. 8, lines 14-15) Joshua testified that he saw his father drop the gun and get shot unarmed (Doc. 50-2, p. 10, lines 6-9) When asked if he ever saw his father point the gun, Joshua responded, "He – no. When they said 'drop it,' he dropped it and kicked it off the porch into the dirt." (Doc. 50-2, p. 10, lines 18-20; 23-5)

As the Defendants' pointed out, the witness's earliest testimony should be considered the most credible. *Aquilar v. U.S. Atty. Gen*, 381 Fed. Appx. 924, 927 (11th Cir. 2010). Here, Joshua Sexton's first two statements, one of which is sworn

to, should be considered credible, and the Internal Affairs statement, which is not sworn to, should be stricken.

According to the law, an unsworn statement should not be considered for summary judgment. *Dudley v. City of Monroeville*, 446 Fed. Appx. 204, 207 (11th Cir. Ala. 2011) citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.27 (11th Cir. 2003). Joshua Sexton's Affidavit is consistent with his initial sworn statement. His affidavit was not made to create a material dispute to defeat Summary Judgment, as Defendant's contend. Using Defendants' argument, Joshua Sexton's Affidavit corroborates his most credible statements, which are his earliest ones.

### 4.  Joshua Sexton's Testimony is Not Contradicted by the Record

Defendants' rely on *Scott v. Harris*, 550 U.S. 372 (2007)(videotape utterly discredited Respondent's version of events), *Kenning v. Carli*, 2016 WL 1534002 (11th Cir. 2016)(autopsy discredited Plaintiff's version of events) and *Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004)(eyewitness version is contradicted by the undisputed, clearly demonstrated, photographed physical evidence) for the proposition, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." However, unlike *Scott*, *Kenning* and *Kesinger*, there is no physical evidence in the record that blatantly contradicts Joshua Sexton's statement

that he observed his father get shot and killed by the Defendants. Therefore, the Court must adopt his version of facts for purposes of ruling on Summary Judgment.

Further, as the District Court correctly ruled, *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005) does not apply to this case because it is distinguishable. Defendants contend Joshua Sexton's multiple contradictory versions of what he saw in regards to his father are too equivocal to create a disputed fact. *Id.* at 16. However, *Evans*, is distinguishable because the court was faced with different versions of the facts—one from the deposition of the non-movant and one more favorable version from another witness's deposition testimony. In *Evans*, the court refused to accept the witness's more favorable version, explaining that "for summary judgment we accept a non-movant's own testimony warts and all, instead of snipping from that testimony the parts that are less favorable than what some other witness says." *Id.* at 1283. Here, Joshua Sexton is not a party to this case, and the principle that a non-movant cannot create a triable issue of fact by using witness testimony that directly contradicts with the non-movant's own testimony does not apply. Here, Joshua Sexton's version does not dispute the non-movant's testimony because the non-movant, Ronald Sexton, is dead. The only version of events provided by Plaintiff is that of Joshua Sexton, which creates disputed facts with Defendants' version of events.

## 5.  A Jury Must Make Credibility Determinations

The trial court is not free to interpret the evidence and disbelieve Plaintiff's asserted facts. *Edwards v. Shanley*, et. al., 666 F.3d 1289, 1293 (11th Cir. 2012) Instead, the Eleventh Circuit explicitly recognized that a jury is free to make its own fact determination, and the Court is mindful that a jury has the opportunity to test the evidence presented by both sides in our time-honored adversarial tradition. *Id.* at 1295.

In *Edwards* Plaintiff alleged that a K-9 repeatedly bit his leg for somewhere between five to seven minutes, and the Plaintiff did not resist. The Court noted, "at summary judgment we must construe the record in the light most favorable to the non-moving party, Edwards... Thus, we conduct our analysis assuming the length of the attack to be five to seven minutes. But in so doing, we are mindful that the trial jury will not be similarly constrained, and will be free to reject Edwards' account as incredible if it so determines." *Id*.  Therefore, the Court ruled that Summary Judgment was not appropriate.

Like *Edwards*, this Court should take the Plaintiff's version of the shooting circumstance as true and allow the jury to determine whether the story is "incredible" in light of all the evidence. The denial of summary judgment will allow a jury to test the evidence presented by both sides. Reasonable inferences at

this stage support denial of summary judgment and pave the way for the jury to make credibility determinations.

Reasonable inferences are inferences reasonably drawn from all facts then before the Court, after sifting through the universe of all possible inferences the facts could support. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Reasonable inferences are not necessarily more probable or likely than other inferences that might tilt in the moving party's favor. *Id.* Instead, so long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the jury is entitled to decide which inference to believe and summary judgment is not appropriate. *Id.*

There is a reasonable inference, as Joshua Sexton maintains, that he witnessed his father's shooting death *after* his father had disarmed himself and was complying with the officers' commands (Doc. 42-1, p. 2, ¶13-17). The affidavit establishes material facts that are in dispute, and due to the nature and circumstances of the Internal Affairs investigation, it should not be used in the determination of summary judgment. Joshua saw his father kick the gun off the porch, he was then kept locked in the house and taken to the station where he made the same statement to the detectives. There is no way he could have said this unless it was in fact what he saw happen. There was no opportunity for Joshua to hear the Defendants' version of events prior to giving his own statement. There

was no chance for the child to concoct this statement because he was isolated and without the support of his mother.[2]

## II. THE COURT SHOULD AFFIRM THE DISTRICT COURT'S FINDING THAT DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Public officials, such as police officers, acting in the course and scope of their employment are shielded from suit against them in their individual capacities if while performing discretionary acts, they commit torts and any such torts do not violate a clearly established statutory or constitutional right. *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11 Cir. 2002); *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The initial burden rests with the officers to establish that they were acting within the scope of their discretionary authority. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009); *citing McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009). If the officers were acting within the scope of discretionary authority, then the burden shifts to the plaintiff to show the grant of qualified immunity is unmerited. *Oliver*, 586 F.3d at 905; *citing McCullough*, 559 F.3d at 1205. at 1205. Qualified Immunity protects officers engaged in discretionary functions from civil liability only if the officers' actions do "not violate clearly established statutory or constitutional rights of which a reasonable person would have know. *Harlow v. Fitzgerald*, 457 U.S. 800,818, 102 S.Ct.

---

[2] In contrast, the Defendants were given the opportunity to meet with their attorney prior to giving their Internal Affairs statement.

2727, 2738 (1982).    A two part analysis is used to determine whether the Plaintiff establishes that the Officers were not entitled to qualified immunity. First, the Plaintiff must establish whether the facts alleged make out a violation of constitutional right and second, that the constitutional right was clearly established at the time of  Officers Mangiaracina, Morales and Romano' conduct. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008), *Oliver*, 586 F.3d at 905; *citing Pearson v. Callahan*, 555 U.S. 223, 129 (2009).

## 1. **Constitutional Violation**

Determining whether the force used was reasonable under the Fourth Amendment requires a careful balancing of the nature of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake. *Crosby v. Paulk*, 187 F.3d 1339, 1351 (11th Cir. 1999). The Supreme Court has stressed that there is no precise test or "magical on/off switch" to determine when an officer is justified in using deadly force. *Scott v. Harris*, 550 U.S. 372, 382 (2007). Nor must every situation satisfy certain preconditions before deadly force can be used. Rather, the particular facts of each case must be analyzed to determine whether the force used was justified under the totality of the circumstances. *Id.* at 382.    This Court, the Eleventh Circuit, has held that in a qualified immunity analysis, a district court must analyze the facts in the light most

favorable to the party asserting the injury, here, the Plaintiff's Estate. *Robinson v.*
*Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005).

In determining whether the facts alleged show the officer's conduct violated
a constitutional right, this Court in *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir.
2016) looked to *Graham v. Connor*, 490 U.S. 386, 394 (1989), to determine when an
officer may constitutionally use deadly force. In *Graham v. Connor*, 490 U.S. 386,
394 (1989), the United States Supreme Court set forth factors to be considered in
assessing the lawfulness of the amount of force used by police officers. The
*Graham* factors include: weighing the amount of force used against "[1] the severity
of the crime at issue, [2] whether the suspect poses an immediate threat to the safety
of the officers or others, and [3] whether [the suspect] is actively resisting arrest
or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396.

Stated by this Court, an officer may use deadly force when the officer:

(1) Has probable cause to believe that the suspect poses a threat of serious

physical harm, either to the officer or to others or that he has committed a

crime involving the infliction of serious physical harm; (2) reasonably

believes that the use of deadly force was necessary to prevent escape; and

(3) has given some warning about the possible use of deadly force, if

feasible. *Perez* at 1218-1219.

In addressing these three factors, the Court should consider the need for the application of the force, the relationship between the need and the amount of force used, and the extent of the injury inflicted. *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).

**Severity of the Crime/ Has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction of serious physical harm;**

Mr. Sexton had not committed a serious offense at the time the Officers responded to the scene. At the very most, he had improperly exhibited a firearm, which is a misdemeanor in the first degree. (Florida Statutes, Section 790.10). At no point did Mr. Sexton ever point his gun at the neighbors. (911 Call Transcript, Doc. 42-2, p. 5, lines 4-9).  Plaintiff's facts are that, law enforcement saw a compliant resident of the home he was living in, standing, then kneeling onto the porch- all acts of compliance, and thus the defendants had no cause to shoot him. (Joshua Sexton Aff.; Doc. 42-1, ¶ 14-17).

First, there was no probable cause to believe that Mr. Sexton had committed a crime, was involved in the infliction or threatened infliction of serious physical harm or that he was a threat. (Romano Depo; Doc. 37-5, p.11 lines 2-17).  The phone call to 911 was about dogs fighting and a gun seen in Mr. Sexton's pocket. All the officers testified they saw him on the porch on the phone with his son. (Morales Depo, Doc. 37-3, p. 28, lines 18; Mangiaracina Depo., Doc. 37-2, p. 13,

lines 19-21, p. 14, lines 21-2; Romano Depo., Doc. 37-5, p. 17, lines 1-7)(Joshua Sexton Aff. Doc. 42-1, ¶ 9). Americans are permitted to have weapons, so the fact that Mr. Sexton had a gun, in and of itself, is not a crime. The officers were getting up to date information from the neighbors who were on the phone with the 911 operator. (Transcript of the 911 call, Doc. 42-2)(Mangiaracina Depo., Doc. 37-2, p. 13, lines 24-5, p. 14, lines 1-3).

The officers decided to approach and "challenge," even though they testified they were supposed to be "investigating." (Mangiaracina Depo., Doc. 37-2, p. 15, lines 6-10). They used a stealth approach. (Mangiaracina Depo., Doc. 37-2, p. 10, lines 18-22). Approximately seven officers lined up in an L shaped formation in front of Mr. Sexton. (Mangiaracina Depo., Doc 37-2, p. 22, lines 2-8). The location was not a bad neighborhood. (Romano Depo, Doc. 37-5, p.13, line 9-12). Instead of talking to Mr. Sexton, they approached with assault weapons, protected by shields and ready to shoot. Yet as they approached, they saw Mr. Sexton, on a lighted porch, talking on his phone and his son standing next to him. It is axiomatic that the gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). Here the defendants did not have probable cause to arrest Mr. Sexton.

**Threat**

Although Mr. Sexton possessed a gun at some point in the evening, the material analysis point is what was happening in the instance immediately before the shooting. When the Officers approached, Mr. Sexton was speaking on his cell phone. (Morales Depo., Doc. 37-3, p. 28, line 18)(Joshua Sexton Aff., Doc. 42-1, ¶ 9) He was not brandishing his weapon. Rather he complied with the Officers commands. (Mangiaracina Depo., Doc. 37-2, p. 17, lines 2-3). The CAD logs show that from the time the Officers attempted to approach Mr. Sexton, until the shooting, about 50 seconds expired. (CAD Log, Doc. 42-3). There is no dispute that in those 50 seconds, Mr. Sexton took it upon himself to get on the ground. Taking Plaintiff's version as true, Joshua Sexton's affidavit establishes Mr. Sexton did not draw his pocketed weapon from the face down position. (Joshua Sexton Aff., Doc. 42-1, ¶13-17) According to Joshua Sexton, Mr. Sexton disarmed himself and put his hands in the air prior to being shot. (Joshua Sexton Aff. Doc. 42-1, ¶13-16) Joshua had warned him that police were coming down the street with a shield. (Joshua Sexton Aff. Doc. 42-1, ¶10-11)

The fast timing and lack of threat is further corroborated by the 911 Call made by Mr. Warren. (911 Call Transcript, Doc. 42-2, p. 15, lines 3-9). Mr. Warren exclaims excitedly and in shock: "Yeah, they ran up on him. Oh, they are shooting him. They are shooting him. Oh, Lord, man…They done killed him.

They done killed him. Oh, Lord, They done killed this man, man." (911 Call Transcript, Doc. 42-2 p. 15, lines 3-9) To his complete surprise, Mr. Warren watched as the Defendants gunned down Mr. Sexton as they ran up on him.

Based on these facts, Mr. Sexton was no threat to the Officers or to any other individuals in the vicinity of this incident. No reasonable officer would think that an individual, who has disarmed himself, raised his arms in the air and subsequently lowered himself to the ground posed any threat to any individual present, let alone the 7 officers.

**Resistance or Evading Arrest**

At no time was Mr. Sexton resisting or evading arrest. Mr. Sexton remained on his front porch, and never attempted to flee or run back inside the house. He followed the Defendants' commands. He dropped his gun. He dropped his cell phone. He put his hands up and got down on the ground. (Joshua Sexton Aff. Doc. 42-1, ¶14-17) He never tried to run from the Officers or resist arrest.

**Officers gave some warning about the possible use of deadly force, if feasible.**

No warning was given to Mr. Sexton. It is clear that the officers shot him almost immediately -within 50 seconds. It would have been reasonable to talk to him from a position of safety but the officers chose not to do that. They decided to "challenge" Mr. Sexton instead of investigating. After approaching with a shield

and 7 officers behind it, they immediately made a L shape in front of Mr. Sexton and the porch.

In addressing the three *Graham* factors, also outlined in *Perez v. Suszczynski*, (11th Cir. 2016) the Court must conclude, according to the Plaintiff's case, that there was no need for force, let alone deadly force, as Mr. Sexton had not committed a serious crime, was compliant with the Defendants' commands and did not pose any threat to any individual. As such, any force used, was excessive and therefore violated Mr. Sexton's constitutional rights. Here, the force was so great it caused the untimely death of Mr. Sexton.

## 2. **Clearly Established**

The question is to be asked whether it would be "'sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009); *citing Wilson v. Layne*, 526 U.S. 603, 615, (1999).   Plaintiffs may demonstrate that the law was "clearly established" with regard to a particular issue in one of three ways. First, they may show that the circumstances surrounding the violation of his or her rights are substantially similar to the factual situation in a previous case. *See Perez v. Suszczynski*, (11th Cir. 2016) ; *Mercado v. City of Orlando,* 407 F.3d 1152, 1159 (11th Cir. 2005) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Second, a plaintiff may demonstrate "that a broader, clearly established principle should

control the novel facts in [his or her] situation." *Id.;* citing *Hope v. Pelzer,* 536 U.S. 730, 741 (2002). *See also Marsh v. Butler County*, 268 F.3d 1014, 1031 n. 9 (11th Cir. 2001) (en banc) ("preexisting case law, tied to the precise facts, is not in every case essential"). Finally, a plaintiff may show that an official's conduct so obviously violated the Constitution that the non-existence of prior law on point is unnecessary. *See Id.* (citing *Lee v. Ferraro,* 284 F.3d 1188, 1199 (11th Cir. 2002)).

In determining whether the law is clearly established, the Supreme Court has reviewed policies, standards and other reports as evidence on other occasions. *See Wilson v. Layne*, 526 U.S. 603, 617-618 (1999) (policies of United States Marshal Service); *Hope v. Pelzer, supra* (state departmental regulations and a Department of Justice report). The Supreme Court's "decisions [have not] demanded precedents that applied the right at issue to a factual situation that is 'fundamentally similar'" to the case at bar to give government officials fair warning that their conduct contravenes constitutional rights. *United States v. Lanier,* 520 US. 259 (1997).

Fair warning may exist even if there are "notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *Id.* Whether the law is "clearly established" requires the Court to "assess whether the facts of the instant case fall within statements of

*general principle* from our precedents." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (emphasis supplied).

Here, the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit. The Plaintiff has demonstrated that the gun was off the porch before the officers shot Mr. Sexton. A person who had a gun and it is later removed, is no different than any other unarmed individual. *Perez v. Suszczynski*, at 11.

In *Rada v. Miami-Dade County* based on longstanding Eleventh Circuit precedent, the district court found it is clearly established that an officer may not use deadly force against a subject that is compliant with the officer's orders. 2006 U.S. Dist. LEXIS 89510 (S.D. Fla. Dec. 7, 2006) citing *Smith v. Mattox*, 127 F.3d 1416, 1419-20 (11th Cir. 1997).

Here, the Defendants ordered Mr. Sexton to show them his hands and get down on the ground. (Joshua Sexton Aff. Doc. 42-1, ¶14-17) Mr. Sexton complied with these commands and during his compliance, he was shot dead with multiple bullets by the Defendants. (Joshua Sexton Aff. Doc. 42-1, ¶14-17) Joshua Sexton goes further to testify that Mr. Sexton did not make any sudden movements, he did not turn around to walk back inside his home, and he did not reach for his weapon prior to being shot. (Joshua Sexton Aff., Doc. 42-1, ¶14-17) Because Mr. Sexton was being compliant with the Defendants' orders, was

unarmed, it is clearly established that the deadly force used by the Defendants was excessive. (Photo of gun in side yard; Doc. 42-4).

The Defendants cite *Riordan v. O'Shea, 448 Fed.Appx 928* (11th Cir. 2011) (suspect running toward officer with a shiny objection in his hand, which appeared to be a tire tool), *Penley v. Eslinger, 605 F. 3d 843* (11th Cir. 2010) (boy pointed modified plastic pistol directly at the officer), *Lenning v. Brantley County, Ga.,* 579 Fed.Appx. 727 (11th Cir. 2014) (suspect aimed his gun at the officer), *Garczynski v. Bradshaw,* 573 F.3d 1158 (11th Cir. 2009) (suspect pointed the gun at the officer), *Quiles v. City of Tampa Police Dept*. 596 Fed.Appx. 816 (11th Cir. 2015) (mistaken belief that suspect stole the Officer's gun), *McCullough v. Antolini*, 559F.3d 1201 (11th Cir. 2009) (high speed chase, when finally pulling over plaintiff refused to show his hands and drove a truck in the direction of a sheriff's deputy), for the proposition that the use of deadly force in the present case is not a clearly established constitutional violation.

However, the present case can be easily distinguished from each of these cases. In all the cases cited by the Defendants, there is a clear deadly threat to the officers. There is no threat to the Officers in the present case. Joshua Sexton's affidavit, Brandy Wallace's affidavit, the 911 call, wherein Mr. Warren is so shocked by the shooting, he hangs up, and the CAD log showing seconds elapsed, all support the Plaintiff's factual scenario that no threat was present.

In the instant case, taking Plaintiff's version as true, Mr. Sexton never threatened the officers, never ran at the officers, never pointed the gun at the officers and was unarmed at the time he was shot to death (Joshua Sexton Aff. ¶14-17). Therefore, in line with *Perez v. Suszczynski*, (11th Cir. 2016)  and *Rada v. Miami-Dade County,* the use of deadly force was a clearly established constitutional violation because the Defendants should not have used deadly force against Mr. Sexton who was compliant with the officers' orders. *Perez v. Suszczynski*, (11th Cir. 2016); *Rada v. Miami-Dade County* 2006 U.S. Dist. LEXIS 89510 (S.D. Fla. Dec. 7, 2006) citing *Smith v. Mattox*, 127 F.3d 1416, 1419-20 (11th Cir. 1997).

Based on the *Graham* factors, law enforcement officers are not entitled to qualified immunity if they shoot and kill a compliant, unarmed suspect. Nor are law enforcement officers entitled to kill a suspect who did not immediately comply with part of an order (i.e., by turning around with his hands raised instead of getting on the ground) unless that action posed an immediate safety threat. *Mercado v. City of Orlando*, 407 F.3d 1152, 1159-1160 (11th Cir. Fla. 2005), citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)(holding that a police officer cannot "seize an unarmed nondangerous suspect by shooting him dead"). Using deadly force in a situation that clearly would not justify its use is unreasonable under the Fourth Amendment. *Mercado* at 1160. As previously discussed, there are

issues of fact whether Mr. Sexton was compliant or had reached for a gun. Therefore, a jury could conclude that Defendants violated Mr. Sexton's constitutional right to be free from excessive force. Accordingly, Defendants are not entitled to qualified immunity at this juncture.

## CONCLUSION

Based on the aforementioned reasons, the court should affirm the District Court's Order denying Appellants Motion for Summary Judgment. Appellee, Brandy Wallace, has alleged sufficient facts to support her theory for holding Appellants liable and they are not protected by qualified immunity. Given the fact that Joshua Sexton's version is in direct contradiction to the Officers' version, Summary Judgment is not appropriate. Based on the above cited authorities and argument, Brandy Wallace respectfully requests that this Court affirm the District Court's order denying Summary Judgment and allow the present case to proceed to trial.

## Certificate of Compliance With Rule 32(A)

1. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 6,468 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Respectfully Submitted,

Michael P. Maddux, Esquire
Florida Bar Number: 0964212
Attorney for Appellee
2102 West Cleveland Street
Tampa, Florida 33606
Phone: (813) 253 - 3363
Facsimile: (813) 253 - 2553
E-Mail: mmaddux@madduxattorneys.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Record Excerpts

by Electronic Mail on this 7th day of July, 2016, upon Joseph P. Patner, Esquire,

joseph.patner@stpete.org and eservice@stpete.org.

Michael P. Maddux
Attorney for Brandy Wallace, Appellee